OPINION OF THE COURT
Román, J.
In 2008, during the financial crisis that left many financial services companies holding billions of dollars in “toxic assets” (undervalued and underperforming assets), plaintiff and defendant UBS Real Estate Securities Inc. (UBSRE) entered into an agreement whereby plaintiff was to act as UBSRE’s “financial advisor and investment banker in the proposed sale of certain of [UBSRE’s] student loan warehouse loan facilities (the ‘Transaction’).” The agreement gave plaintiff the “exclusive right to solicit counterparties for any potential Transaction involving the Student Loan Assets during the term of this Agreement.” Moreover, according to the agreement, upon the closing of “the Transaction,” plaintiff would be paid a success fee for its services, which would he calculated as a percentage of the “Transaction Amount,” “defined as the agreed value of the Student Loan Assets which are transferred or sold to a third party, or in respect to which the risk of first loss is assumed by a third party, in one or a series of transactions” (emphasis added).
Alleging that defendants breached the agreement, plaintiff sued, claiming, inter alia:
“On October 16, 2008, during Morpheus’ exclusivity *148 period, Defendant UBS AG reached an agreement with the Swiss National Bank (‘SNB’) and a third party fund (the ‘Stabilization Fund’) whereby the student loan assets [held by UBSRE] would be sold to the Stabilization Fund. This deal . . . relievefd] UBS AG and UBSRE of the risk of any further loss with respect to those assets . . .
“[and that] [b]y entering into that agreement . . . UBSRE . . . breached the Agreement with Morpheus” (emphasis added).
Defendants moved for pre-answer dismissal of the complaint pursuant to CPLR 3211 (a) (1) and (7). Holding that defendants had established both a frustration of purpose defense and that the complaint failed to state a cause of action against UBS AG, the motion court granted defendants’ motion in its entirety. Plaintiff appealed, and upon a review of the record, we conclude that the motion was erroneously granted to the extent it sought dismissal of the claims asserted against UBSRE.
The motion court erred in dismissing the complaint pursuant to CPLR 3211 (a) (1) (defense founded on documentary evidence) on the ground that the purpose of the parties’ agreement was frustrated by SNB’s creation of the Stabilization Fund (Fund) into which UBSRE could deposit its allegedly toxic assets and free itself of the risk involved in maintaining such debt on its books, and that UBSRE was thus relieved of any duty to pay the success fee.
“The doctrine [of frustration of purpose] applies when a change in circumstances makes one party’s performance virtually worthless to the other, [thereby] frustrating his purpose in making the contract” (PPF Safeguard, LLC v BCR Safeguard Holding, LLC, 85 AD3d 506, 508 [2011] [internal quotation marks omitted]). However, the defense is not available when the event preventing performance was foreseeable (Warner v Kaplan, 71 AD3d 1, 6 [2009], lv denied 14 NY3d 706 [2010]), or where the party asserting the defense, “through the conduct of its principals, was responsible for the events which transpired” (VJK Prods., Inc. v Friedman/Meyer Prods., Inc., 565 F Supp 916, 921 [SD NY 1983]).
A motion to dismiss premised on documentary evidence “may be appropriately granted only where the documentary evidence utterly refutes plaintiff’s factual allegations, conclusively establishing a defense as a matter of law” (see Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002]). Here, while *149 defendants aver that the creation of the Fund frustrated the purpose of the agreement, they nevertheless fail to establish that defense with documentary evidence. The very documents defendants submit in support of their motion establish that the creation of the Fund was in fact foreseeable and contemplated by the parties in the agreement. Specifically, the agreement contains a provision compensating plaintiff in the event of a transaction where the risk of loss was, as alleged here, assumed by a third party. Accordingly, in premising plaintiffs compensation on the sale, transfer or, as here, assumption of UBSRE’s student loan assets by another, the Fund’s creation and UBSRE’s transfer of its assets thereto was foreseeable.
Furthermore, the documents submitted by defendants in support of their motion also fail to establish that the creation of the Fund was, in and of it itself, the event which frustrated the purpose of the agreement. Specifically, these documents fail to conclusively establish that the creation of the Fund, rather than defendants’ decision to avail themselves of it, rendered plaintiff’s performance under the agreement—finding a purchaser for the very assets that UBSRE transferred into the Fund—“virtually worthless” to UBSRE (VJK Prods., Inc. at 920-921). Therefore, defendants fail to establish their frustration of purpose defense as a matter of law.
The dissent asserts that the agreement itself, which defendants submitted in support of their motion to dismiss, establishes defendants’ right to dismissal. Specifically, the dissent notes that the portion of the agreement entitled “Scope of Engagement” requires plaintiff to “[i]dentify, introduce and assess appropriate investors.” Similarly, the dissent notes that the portion of the agreement that contemplates payment to plaintiff when the “Student Loan Assets . . . are transferred or sold to a third party, or . . . [when] the risk of first loss is assumed by a third party, in one or a series of transactions,” precludes compensation to plaintiff because UBSRE transferred its assets to the Fund created by SNB, a party that plaintiff did not and could not introduce to UBSRE. The crux of the dissent’s argument, therefore, is that the agreement grants plaintiff an exclusive agency rather than an exclusive right to sell. Thus, the dissent concludes, defendants did not breach the agreement, because plaintiff did not broker UBSRE’s transfer of its toxic assets into the Fund, and under the circumstances, plaintiff has no cause of action for breach of contract. While we agree that plaintiff was granted only an exclusive agency, we disagree that *150 plaintiff fails to state a cause of action for breach of contract or that defendants established a defense based on documentary evidence.
The dissent correctly notes that generally under an exclusive agency agreement no liability to pay commissions arises absent the participation of the party to whom the exclusive agency is granted (U.S. No. 1 Laffey Real Estate v Hanna, 215 AD2d 552, 553 [2d Dept 1995], lv denied 87 NY2d 804 [1995]). We further agree with the dissent to the extent it notes that here the agreement only confers an exclusive agency to plaintiff insofar as it does not expressly prohibit UBSRE from finding a buyer for its toxic assets and thereafter engaging in a self-brokered sales transaction (see Carnes Communications v Dello Russo, 305 AD2d 332, 332 [1st Dept 2003]). However, the dissent erroneously contends that since plaintiff only had an exclusive agency and did not introduce UBSRE to the Fund, the agreement precludes a breach of contract claim.
A review of the agreement establishes that while plaintiff was only granted an exclusive agency, the agreement nevertheless gave plaintiff “the exclusive right to solicit counterparties for any potential Transaction involving the Student Loan Assets during the term of this Agreement.” Read broadly, the allegations in the complaint, which on a motion to dismiss pursuant to CPLR 3211 (a) (7) we deem as true (see Sokoloff v Harriman Estates Dev. Corp., 96 NY2d 409, 414 [2001]; Cron v Hargro Fabrics, 91 NY2d 362, 366 [1998]), state a cause of action for breach of contract.
Specifically, the complaint alleges “[t]he Agreement provided Morpheus with the ‘exclusive right to solicit counterparties’ for any potential transaction,” and premises the breach of contract claim on, inter alia, UBSRE’s failure to give plaintiff the right to solicit counterparties before transferring its assets to the Fund (Harris v Seward Park Hous. Corp., 79 AD3d 425, 426 [1st Dept 2010] [the essential elements of a cause of action for breach of contract are the existence of a contract, the plaintiffs performance under the contract, the defendant’s breach of that contract, and resulting damages]). Contract provisions should be given their plain and ordinary meaning (Rosalie Estates v Colonia Ins. Co., 227 AD2d 335, 336 [1st Dept 1996]), and when clear, a contract ought to “be enforced according to its terms” (Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004] [internal quotation marks omitted]). Accordingly, since the agreement required UBSRE to give plaintiff the *151 opportunity to solicit a counterparty prior to transferring its assets into the Fund, and since plaintiff pleads a breach of that very term, the complaint states a cause of action for breach of contract. This is true, even if, as asserted by the dissent, the agreement only granted plaintiff an exclusive agency rather than an exclusive right to sell.
Moreover, just as defendants’ documentary evidence fails to establish their frustration of purpose defense, they similarly fail to establish that they did not breach the agreement. In other words, nothing submitted by defendants establishes a defense to the allegations in the complaint that defendants were required to give plaintiff the right to solicit a counterparty to any transaction involving the loan assets, including the one at issue here.
Paradoxically, the dissent notes that plaintiff never introduced UBSRE to any counterparties and then argues—in complete disregard of the portion of the agreement requiring that UBSRE afford plaintiff the right to solicit a counterparty—that in transferring its student loan assets to the Fund, defendants did not breach the agreement. According to plaintiffs complaint, it is UBSRE’s alleged failure to afford plaintiff the opportunity to solicit a counterparty for the instant transaction, as required by the agreement, that forms one basis for plaintiff’s breach of contract claim. Thus, plaintiff has pleaded a cause of action for breach of contract.
Nor does this portion of the agreement seek to impermissibly grant plaintiff either an exclusive right to sell or a right of first refusal. As to an exclusive right to sell, we have already held that the agreement grants plaintiff only an exclusive agency. Accordingly, we need not elaborate further. As to a right of first refusal, whether the agreement grants plaintiff such a right is an issue we need not reach because it is raised solely by the dissent. Suffice it to say, however, that a plaintiffs failure to plead that it had a viable counterparty for UBSRE’s toxic loan assets would not, standing alone, preclude a breach of contract claim based upon a defendant’s failure to adhere to a right of first refusal provision. Indeed, “[t]he obvious effect of the right of first refusal is to give to the nonselling party a power to control and restrict the other party’s right to sell to a third party” (LIN Broadcasting Corp. v Metromedia, Inc., 74 NY2d 54, 62 [1989]). The clause itself, therefore, operates as a restriction by preventing a party from making a sale without first making the first refusal offer (id.). As a result, when the selling party has fully complied with its obligations under the first refusal clause by *152 “not selling without first making the required offer, the nonselling party has received the bargained-for performance” (id.). Hence, if the parties have bargained for notification of an impending sale to the party who holds the right of first refusal, the failure to provide such notice, as is alleged here, constitutes sufficient grounds for a breach of contract claim.
To the extent that the agreement unambiguously and without limitation contemplates compensation to plaintiff when “the risk of first loss is assumed by a third party, in one or a series of transactions,” and does not limit compensation to plaintiff only if it introduced such third party to UBSRE, we also find merit to plaintiff’s contention that the agreement mandated compensation for any transaction involving UBSRE’s toxic assets during the term of the agreement. Nor can it be said, as posited by the dissent, upon a review of this provision that the parties sought to preclude compensation upon action by SNB, which in creating the Fund acted “as a regulator charged with overseeing the financial health of the Swiss banking System.” Accordingly, the dissent ignores the well settled tenets that we must be guided by the clear and express language of the agreement and that “courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing” (Vermont Teddy Bear Co. at 475 [internal quotation marks omitted]).
Additionally, while it is certainly true that the portion of the agreement requiring the plaintiff to “[identify, introduce and assess appropriate investors” is indicative of the intent to compensate plaintiff only when UBSRE sold its toxic assets to a party introduced by plaintiff, this provision, to the extent it is at odds with the provision requiring compensation solely when “the risk of first loss is assumed by a third party, in one or a series of transactions,” merely creates an ambiguity, warranting denial of defendants’ pre-answer motion to dismiss (see Telerep, LLC v U.S. Intl. Media, LLC, 74 AD3d 401, 403 [1st Dept 2010] [because at least two reasonable interpretations of contract language are possible, the provision is ambiguous and dismissal “pre-answer before the development of a full factual record as to the parties’ intent” is not appropriate]; Hambrecht & Quist Guar. Fin., LLC v El Coronado Holdings, LLC, 27 AD3d 204 [1st Dept 2006]). Rather than conceding that the ambiguity precludes granting defendants’ motion, however, the dissent proceeds to impermissibly engage in either speculation or *153 contract interpretation. Specifically, the dissent, diminishing the import of a clear contractual provision, states that the “obvious explanation for the contractual reference to assumption of the risk of loss is the potential for entering into a credit default swap arrangement.” This attempt to interpret and reconcile contractual provisions that are susceptible of more than one interpretation, and therefore ambiguous, is clearly inappropriate in the context of a motion to dismiss (Telerep at 403).
The motion court properly dismissed plaintiff’s action against defendant UBS AG since plaintiffs complaint fails to state a cause of action against it. Generally, in order to pierce the corporate veil, it must be established that “(1) the owners [of a corporation] exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or . wrong against the plaintiff which resulted in plaintiffs injury” (Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 141 [1993]). Moreover, when a complaint fails to plead that the parent company engaged in self-dealing, commingled funds, or lacked corporate formalities, a complaint seeking to pierce the corporate veil should be dismissed for failing to state a cause of action (see Hartej Corp. v Pepsico World Trading Co., 255 AD2d 233, 233 [1st Dept 1998]; cf. International Credit Brokerage Co. v Agapov, 249 AD2d 77, 78 [1st Dept 1998]). Lastly, since adequate corporate capitalization sufficient to meet contingent liability is a factor when determining the merit of a veil-piercing claim, the failure to plead this element warrants dismissal of a complaint asserting an alter-ego claim (see ABN AMRO Bank, N.V. v MBIA Inc., 17 NY3d 208, 229 [2011]; Allstate ATM Corp. v E.S.A. Holding Corp., 98 AD3d 541, 542 [2d Dept 2012]; Grammas v Lockwood Assoc., LLC, 95 AD3d 1073, 1075 [2d Dept 2012]).
Here, while plaintiff pleads that “UBS AG controlled, directed and dominated UBSRE with respect to the Transaction with the Stabilization Fund and SNB involving the Student Loan Assets,” it nevertheless fails to plead the additional elements of self-dealing, commingling of funds, lack of corporate formalities, and that UBSRE was undercapitalized, elements which are required when pleading an alter-ego cause of action (ABN AMRO Bank, N.V. at 229; Allstate ATM Corp. at 542; Grammas at 1075; Hartej Corp. at 233). In fact, the conclusory allegations in the complaint amount to nothing more than allegations that UBS AG made decisions for UBSRE. Thus the complaint was *154 properly dismissed as against UBS AG (CPLR 3211 [a] [7]; Dabrowski v ABAX Inc., 64 AD3d 426, 427 [1st Dept 2009]). Insofar as the dismissal of the complaint against UBS AG was for the failure to state a cause of action, such dismissal “is without prejudice to the right of plaintiff to apply at Special Term upon a proper showing for leave to plead again” (Antel Oldsmobile-Cadillac v Sirus Leasing Co., Div. of Sirus Enters., 101 AD2d 688, 689 [4th Dept 1984]; CPLR 3211 [e]; Sanders v Schiffer, 39 NY2d 727 [1976]; Janssen v Incorporated Vil. of Rockville Ctr., 59 AD3d 15, 27-28 [2d Dept 2008]).
We have considered the parties’ remaining arguments and find them unavailing.
Accordingly, the judgment of the Supreme Court, New York County (Barbara R. Kapnick, J.), entered March 18, 2011, dismissing the complaint with prejudice, should be modified on the law, without costs, to the extent of vacating that part of the judgment dismissing the complaint as against defendant UBS Real Estate Securities Inc., and directing that dismissal of the complaint as against defendant UBS AG be without prejudice, and otherwise affirmed, without costs. The appeal from the order of the same court and Justice, entered January 4, 2011, should be dismissed, without costs, as subsumed in the appeal from the judgment.
Tom, J.P (dissenting). The majority misconstrues a mere definition as the expression of the parties’ entire brokerage agreement, thereby transforming a contract that expressly confers the exclusive right to deal (exclusive agency) into one that confers the exclusive right to sell, in contravention of the rule that a court may not “rewrite the terms of an agreement under the guise of interpretation” (see 85th St. Rest. Corp. v Sanders, 194 AD2d 324, 326 [1993]; Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004]). Under an exclusive agency contract, no liability to pay a commission is incurred where the property is transferred to a purchaser located by the client, without the participation of either the contracting broker or any other' (e.g. U.S. No. 1 Laffey Real Estate v Hanna, 215 AD2d 552 [2d Dept 1995], ;lv denied 87 NY2d 804 [1995]). Nor will a contract “be construed to create an exclusive right to sell unless it expressly and unambiguously provides for a commission upon sale by the owner or excludes the owner from independently negotiating a sale” (Far Realty Assoc. Inc. v RKO Del. Corp., 34 AD3d 261, 262 [1st Dept 2006]). Because it is conceded that the subject property was transferred without the *155 intervention of any broker, it is unnecessary to reach the issue of whether the purpose of the brokerage agreement was frustrated. To the extent the question is pertinent, it should be noted that no explanation has been offered as to why the purpose of the parties’ agreement was not frustrated by the absence of any market for the property.
On a pre-answer motion to dismiss, the issue is whether a cause of action exists, not whether the complaint properly states one (Rovello v Orofino Realty Co., 40 NY2d 633, 636 [1976]), an issue that presents a question of law for the court (see Rajagopalan v Mount Sinai Med. Ctr., 2 AD3d 232 [1st Dept 2003]). While plaintiff has attempted to frame the pleadings to fit within a cause of action for breach of a brokerage contract, specifically an exclusive right to sell contract, what transpired was not within the contemplation of the parties or their agreement, and plaintiff cannot recover under the instrument.
Briefly stated, this is an action to recover a broker’s fee in the amount of $2,887,500 under an agreement between plaintiff Morpheus Capital Advisors (MCA) and defendant UBS Real Estate Securities (UBSRE), a subsidiary of the Swiss banking giant defendant UBS AG. The agreement dated September 19, 2008 recites that “UBS Real Estate Securities Inc. . . . has chosen to engage Morpheus Capital + Advisors LLC (‘MCA’) as its financial advisor and investment banker in the proposed sale of certain of its student loan warehouse loan facilities (‘the Transaction’).” Section 1, entitled “Scope of Engagement,” specifies 10 services to be provided by MCA, first and foremost: “Identify, introduce and assess appropriate investors,” as to which UBSRE agreed that “MCA shall have the exclusive right to solicit counterparties for any potential Transaction involving the Student Loan Assets during the term of this Agreement.”
Drafted as an exclusive agency (exclusive right to deal) contract, the agreement provides limited protection to MCA against a sale arranged by another broker. Section 5, “Termination of Engagement—Exclusivity,” provides that if UBSRE
“completes any Transaction with a party or parties (‘Investor’) (1) introduced to the Company by MCA, (2) introduced to the Company by another party other than MCA, but MCA performed substantially all the services set forth herein in Section 1 prior to the termination of this Agreement, then MCA shall be entitled to its full fees as described above, until March 31, 2009.”
*156 There is no question that disposition of the subject student loan assets was not the result of any efforts by MCA or any other broker. In October 2008, the Swiss National Bank (SNB), in an attempt to stabilize its national financial market, issued a press release announcing measures intended to assist UBS AG by strengthening its capital base, including “the possibility to transfer illiquid assets to a special purpose vehicle (SPV) for orderly liquidation,” together with an agreement with UBS AG for “long-term financing and orderly liquidation of illiquid securities and other troubled assets in the amount of no more than USD 60 billion.” On November 27, 2008, the SNB established a stabilization fund (the StabFund) to receive impaired assets.[1] The first quarter 2009 report indicates that UBS AG made three asset transfers to the StabFund: $16.4 billion in December 2008, $22.2 billion in March 2009 and $15.7 billion in April 2009. The parties have not provided any documentation of these transfers, and while the record contains excerpts from a “master assignment agreement” disclosing the transfer, on April 3, 2009, of “Student Loans identified on Schedule II hereto” and “Student Loans identified on Schedule IV hereto,” the referenced schedules are not included in the record. Thus, the actual date on which the student loan assets subject to the parties’ agreement were transferred to the StabFund remains a question of fact, including whether the transfer was effected during the time period governed by the parties’ agreement so as to obligate UBSRE to pay MCA the success fee sought, as urged by MCA.
UBS AG and UBSRE brought the instant pre-answer motion to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7).[2] Supreme Court dismissed the complaint as against UBS *157 AG on the ground that it was not a party to the agreement and as against UBSRE on the ground' that the purpose of the contract was frustrated by the intervention of the SNB. While MCA disputes these rulings, it has no basis for recovery under the instrument, and the complaint was appropriately dismissed against defendants under CPLR 3211 (a) (7).
MCA does not pretend that it introduced to UBSRE a party that was ready, willing and able to purchase the property offered for sale (see Curtis Props. Corp. v Greif Cos., 212 AD2d 259, 263 [1st Dept 1995]), that is, a “counterparty” pursuant to section 1 of the agreement. Rather, MCA claims entitlement to payment of the success fee under the exclusivity provision of the agreement. MCA contends that the transfer (or, at least, the equitable transfer) of the property took place during the life of the agreement which, the complaint states, expired on December 31, 2008. MCA contends that the establishment of the special purpose vehicle by the SNB to receive impaired assets held by UBS AG effectively transferred the risk of loss on the student loan portfolio from UBSRE to the StabFund. In support of this argument, it alludes to the agreement’s definition of “Transaction Amount,” on which the brokerage fee is calculated:
“For purposes of this Agreement, the ‘Transaction Amount’ is defined as the agreed value of the Student Loan Assets which are transferred or sold to a third party, or in respect to which the risk of first loss is assumed by a third party, in one or a series of transactions.”
MCA further argues that this provision establishes that the creation of the StabFund was anticipated by the parties’ agreement so as to defeat UBSRE’s claim of frustration of purpose.
To accept MCA’s reasoning requires casting the SNB in a role it clearly does not play—that of broker. The exclusivity provision requires payment of the success fee if UBSRE “completes any Transaction with a party . . . introduced to the Company by another party other than MCA . . . prior to the termination of this Agreement.” To qualify under MCA’s theory of recovery, this Court would be required to accept the notion that the SNB “introduced” UBS AG to the StabFund.
There are several deficiencies in this concept. First, as the complaint acknowledges, UBS AG was the party responsible for *158 the transfer of its subsidiary’s assets, not UBSRE itself.[3] Second, the StabFund, the special purpose vehicle set up to receive the impaired assets, was not a party that could be “introduced” (by MCA or any other broker) to either UBS entity since it did not exist until created at the instance of the SNB (which provided all of the financing necessary to the StabFund’s operation). Third, in creating the fund, the SNB did not function in the role of broker but in its official capacity as a regulator charged with overseeing the financial health of the Swiss banking system.[4] As the largest bank in Switzerland, UBS AG hardly needed to be “introduced” to the SNB, and it is naive to attempt to apply a commercial brokerage agreement to regulatory action undertaken to ward off a threat to the financial stability of a sovereign nation’s banking system. Nothing in the parties’ agreement suggests that they intended the success fee to be payable as a result of regulatory action taken with respect to the distressed student loan assets. Finally, to accept the majority’s reasoning that transfer to the StabFund of the risk of loss on the impaired assets would require construing the agreement as an exclusive right to sell contract, in contravention of the express recitation that it confers only “the exclusive right to solicit [potential] counterparties” to acquire the assets or assume any potential loss.
In short, the fatal defect in the complaint is that it provides no reason why a contract entered into in a commercial context for a commercial purpose should be applied to regulatory action undertaken by a central bank in its supervisory capacity. Does MCA—or the majority—seriously suggest that had the Federal Reserve Bank directed UBS AG to transfer the subject student loan assets to Sallie Mae (SLM Corporation; originally, the Student Loan Marketing Association), MCA would thereby be entitled to its success fee under the agreement?
To arrive at its disposition, the majority attaches undue significance to the definition of “Transaction Amount,” which contemplates not only a transaction in which the distressed as *159 sets are acquired but also one in which the risk of loss is assumed. They fabricate from this oblique reference the conclusion that the parties must have anticipated the creation of the StabFund because, with its creation, the risk of loss was effectively removed from UBSRE. This interpretation completely ignores the agreement’s provision that “MCA shall receive a Success Fee payable upon the closing of the Transaction” and the definition’s own reference to the assumption of risk “by a third party, in one or a series of transactions.” Clearly, the agreement conditions payment of the success fee on the occasion of a transaction, not merely the prospect of a transaction, intended to transfer the risk of loss.[5] At best, MCA has alleged an equitable transfer involving the subject property, which fails to satisfy the terms of the exclusivity provision that UBSRE complete a transaction with a party introduced to it by (1) MCA or (2) “another party . . . prior to the termination of this Agreement” to be entitled to payment of a success fee.
Construing a passing reference to the transfer of risk of loss as an expression of the parties’ anticipation that the SNB would create a special purpose vehicle to receive the distressed assets is an untoward conceptual leap. The obvious explanation for the contractual reference to assumption of the risk of loss is the potential for entering into a credit default swap arrangement, by which the counterparty introduced to UBSRE agrees (for a fee) to bear the loss resulting from any impairment in the value of the assets. Under this scenario, ownership remains with UBSRE, and there is no transfer of the assets to provide a valuation date. Hence, the alternative reference to the date the risk of loss is assumed. This construction is supported by a carve out in the agreement providing that no success fee is payable in the event (among others) that a credit default swap or derivative transaction is consummated with one of two named parties.
Another deficiency in the majority’s position is that the brokerage agreement provides for an exclusive agency (“the exclusive right to solicit counterparties”), not an exclusive right to sell. A party that enters into an exclusive agency provision with a broker is free to transfer the subject property to a buyer that the seller locates or, as here, independently locates the seller (see US. No. 1 Laffey Real Estate, 215 AD2d at 553; Far *160 Realty Assoc. Inc., 34 AD3d at 262). To reach the contrary conclusion that a success fee was earned by MCA when the risk of loss was transferred to the StabFund, the majority abrogates a fundamental principle of contract interpretation and strains to find an ambiguity where none exists. As stated by the Court of Appeals, the objective “in searching for the probable intent of the parties ... is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations” (Sutton v East Riv. Sav. Bank, 55 NY2d 550, 555 [1982] [internal quotation marks omitted]; see also Greenwich Vil. Assoc. v Salle, 110 AD2d 111, 114 [1st Dept 1985] [“In construing the terms of a contract, the judicial function is to give effect to the parties’ intentions”]).
Contrary to the majority’s position, there was no breach of the brokerage agreement since it is undisputed that plaintiff never introduced any counterparty to UBS. The majority reads the exclusivity provision in a vacuum, without regard for its stated purpose, effectively elevating the nature of the parties’ agreement to an exclusive right to sell (see e.g. Barnet v Cannizzaro, 3 AD2d 745, 746 [2d Dept 1957]). The agreement explicitly confines the scope of MCA’s engagement to “the exclusive right to solicit counterparties.” The exclusivity provision requires payment of the success fee only if UBSRE “completes any Transaction with a party . . . introduced to the Company by another party other than MCA, but MCA performed substantially all the services set forth herein in Section 1.” Read in context of the contract as a whole and according due regard to the parties’ plainly stated intentions as to the scope of MCA’s engagement, the provision protects only MCA’s exclusive right to deal, and the use of the term “introduced” clearly implicates intervention by another broker. Since it is undisputed that no other broker was involved, UBSRE was free to dispose of the subject assets to a party located either by it or its parent and alleged alter ego, and the success fee is not payable (see Far Realty Assoc. Inc. v RKO Del. Corp., 34 AD3d at 262; Solid Waste Inst. v Sanitary Disposal, 120 AD2d 915, 916 [3d Dept 1986] [exclusive agency contract “merely excludes the employment of another broker by the owner in making a sale”]). Significantly, plaintiffs complaint mentions nothing of plaintiffs “substantial performance”—or any performance at all pursuant to section 5 of the agreement.
To the extent the agreement might be considered ambiguous, as the majority postulates, there is merit to the argument *161 advanced by defendants. However, the purpose of the parties’ agreement was frustrated not by the intervention of the SNB, specifically, but by the circumstances that prompted its intervention—the lack of a market for the subject securities. It is for this reason that they are referred to as “toxic assets”—nobody wants to hold them. Nor do central banks have any desire to see such assets come to market. Permitting the market to establish a highly discounted value for toxic assets held by major banks would have a highly negative effect on the amount of the banks’ required capital reserves, if not their very solvency, and this explains the need for central bank purchases of such assets. While MCA invites this Court to indulge in the fiction that the SNB introduced UBSRE to the StabFund it established and to treat the fund and the central bank as discrete entities, the reality is that the SNB, as the party providing 100% of the funds to effectuate the StabFund’s asset acquisitions ($54 billion in long-term financing and $6 billion in direct equity investment), is the effective purchaser. Given the necessary and longstanding working relationship between UBS AG and the SNB, it should be clear that if any party can be said to have located the ultimate purchaser, it was UBS AG. Realistically, it was the SNB, as central bank, that orchestrated and financed the transfer from UBS AG to the StabFund, as the central bank’s agent.
The proposition advanced by the majority that UBSRE was under the obligation to afford MCA an opportunity to solicit a counterparty to the transaction before transferring the assets to the StabFund is unsupported by any cited authority. As stated at the outset, the applicable authority is to the contrary. It is well established that under a brokerage contract such as this, which bestows only the exclusive right to deal, a seller incurs no liability to pay a commission where the subject property is transferred to a purchaser located without the participation of any broker. The majority, while purporting to interpret the contract to give its language “plain and ordinary meaning,” impermissibly adds to its terms. Engrafted onto the parties’ agreement is an ill-defined right akin to an augmented right of first refusal in favor of a counterparty yet to be located by MCA. This hypothetical counterparty is then afforded the preemptive right to acquire the distressed assets ahead of the purchaser located by UBSRE. The practical effect of such an arrangement, as the Court of Appeals observed, “is to bind the party who desires to sell not to sell without first giving the other party the *162 opportunity to purchase the property at the price specified” (LIN Broadcasting Corp. v Metromedia, Inc., 74 NY2d 54, 60 [1989]). However, such a right cannot be left to implication but must, of necessity, be incorporated into an express agreement (see e.g. id. at 57; American Broadcasting Cos. v Wolf, 52 NY2d 394, 397-398 [1981]).
The obvious difficulty that arises in connection with a right of first refusal bestowed in futuro is the amount of time to be allotted to the broker to locate a suitable counterparty to acquire the distressed assets (or to assume the risk of loss they entail). Since the Court of Appeals has rejected the proposition that a right of first refusal remains open for the period of time specified in a contract (LIN Broadcasting Corp., 74 NY2d at 62), it is difficult to imagine the Court embracing the notion that where, as here, no time is specified by agreement, the right should be deemed irrevocable for an indefinite period while the unknown party who may exercise that right can be located. Once again, MCA does not purport to have a counterparty ready, willing or able to purchase the illiquid assets. Finally, as a purely practical consideration, there is simply no possibility that MCA could locate a prospective counterparty willing to acquire the assets on the terms offered by the SNB.
Even if the contract were amenable to the remarkable construction urged, MCA has never attempted to demonstrate either that it located a potential purchaser for the assets at a price acceptable to UBSRE or that it had any reasonable prospect of doing so. It is axiomatic that the objective of any brokerage arrangement is to find a buyer who will tender a market price for the subject property to which the seller is amenable. Indeed, the condition in the brokerage agreement that UBSRE is liable to pay a success fee only if it actually consummates a transaction with a counterparty to which it has been “introduced” recognizes rapidly deteriorating market conditions, which raised the distinct eventuality that UBSRE might find any price offered for its loan portfolios to be unacceptable. Thus, what MCA has not alleged—and cannot establish—is the existence of any viable market for the distressed student loans of which UBSRE sought to rid itself. The whole point behind the acquisition of such “toxic assets” by the SNB and other central banks was to avoid their depreciation to market levels by substituting an artificial valuation. What has escaped discussion is that neither UBSRE nor any other financial institution in possession of such poor quality investments would have been *163 willing or able to dispose of them in the open market due to the devastating impact on their capital reserves, including the possibility that the reduction of required capital would render the institution insolvent. Hence, this desperate attempt by MCA to insinuate itself into the financial rescue of UBS AG by the SNB, entirely at the central bank’s expense, to seek payment of a success fee the broker could not possibly hope to have earned.
In sum, there is no conceivable way that the parties’ brokerage agreement can be stretched to cover the transaction arranged by the Swiss central bank (in common parlance, a “bailout”). MCA does not pretend that it earned the success fee, and there is no equitable basis for affording it relief.
Accordingly, the judgment should be affirmed.
Andrias and Moskowitz, JJ., concur with Román, J.; Tom, J.E, dissents in a separate opinion.
Judgment, Supreme Court, New York County, entered March 18, 2011, modified on the law, and otherwise affirmed, without costs. Appeal from order, same court, entered January 4, 2011, dismissed, without costs, as subsumed in the appeal from the judgment.

. According to the fourth quarter report purchase for 2008, the SNB provided a loan “in the amount of 90% of the purchase price to be paid by the fund” for the acquired assets. The balance of 10% took the form of a direct equity contribution by the central bank.

. The motion to dismiss was made on the record, the accompanying affirmation does not set forth the legal grounds on which dismissal is sought, and the memoranda of law are not part of the record. MCA, in opposing the motion, accused UBS of making “fact-based arguments” and failing to provide it with an October 2008 contract concerning the transfer of the student loan assets (not included in the record) which, the reply indicated, had already been disclosed by UBS. MCA then submitted, by way of surreply, an application to amend the complaint to add a claim to reform the contract, to which UBS responded. Appropriately, the latter application is not addressed in the decision and judgment and is not before us on appeal (see Lumbermens Mut. Cas. Co. v Morse Shoe Co., 218 AD2d 624, 625-626 [1st Dept 1995]).

. The complaint implicitly concedes that the transfer was effected by UBSRE’s parent, alleging that “UBS AG controlled, directed and dominated UBSRE with respect to the Transaction with the Stabilization Fund and SNB involving the Student Loan Assets.” Thus, it alleges that “UBSRE, as controlled, directed and dominated by UBS AG, breached the exclusivity provision in the Agreement.”

. The SNB performs in a capacity similar to that of the United States Federal Reserve, implementing monetary policy and ensuring financial system stability under constitutional mandate.

. The majority fails to distinguish between the agreement’s fees and expenses provision, setting the amount of the success fee to be paid (section 2), and the exclusivity provision, establishing the conditions under which the success fee is payable (section 5), under which MCA claims payment is due.